**STATE OF NEW HAMPSHIRE**

**ROCKINGHAM, SS.**                                        **SUPERIOR COURT**

**DOCKET NO.**

| |
|---|
| **JOHN DOE AM, JOHN DOE DS, JOHN DOE DZ, JOHN DOE DN, JOHN DOE PJ, and JOHN DOE PT[1], Plaintiffs**<br><br>**v.**<br><br>**BOY SCOUTS OF AMERICA, and DANIEL WEBSTER COUNCIL, BOY SCOUTS OF AMERICA,**<br><br>**Defendants.** |

<u>**JURY DEMAND**</u>

The Plaintiff demands a trial by jury on all issues so triable.

<u>**COMPLAINT**</u>

NOW COME the Plaintiffs, John Doe AM, John Doe DS, John Doe DZ, John Doe DN, John Doe, PJ, and John Doe PT, by and through their counsel, to file this action against the Defendants, Boy Scouts of America and Daniel Webster Council, Boy Scouts of America (collectively "Defendants"), for an award of money damages arising from the sexual abuse endured by the Plaintiffs due to, among other things, the Defendant's misfeasance, nonfeasance, and malfeasance.

---

[1] Contemporaneously with this Complaint, the Plaintiffs have filed a motion to proceed under pseudonyms. The legal and factual authority contained in that motion supports the Plaintiffs' proceeding under pseudonyms to protect the identity of the Plaintiffs who are victims of child sexual abuse as a result of, among other things, the Defendants' misfeasance, nonfeasance, and malfeasance. The identities of the Plaintiffs, including their full addresses, have been provided to the Court and to opposing counsel in a sealed affidavit submitted with the filings.

**PARTIES**

1. The actions that led to this Complaint occurred in and around Rockingham County, New Hampshire.

2. Plaintiff John Doe AM is an adult resident of Manchester, Hillsborough County, New Hampshire.  At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe AM was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

3. Plaintiff John Doe DS is an adult resident of Raymond, Rockingham County, New Hampshire.  At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Davidson was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

4. Plaintiff John Doe DZ is an adult resident of Greenland, Rockingham County, New Hampshire. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe DZ was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

5. Plaintiff John Doe DN is an adult resident of Epping, Rockingham County, New Hampshire. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe DN was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

6. Plaintiff John Doe PJ is an adult resident of Norwood, Rockingham County, New Hampshire. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe PJ was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

7. Plaintiff John Doe PT is an adult resident of Biloxi, Harrison County, Mississippi. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff

2

John Doe PT was an unemancipated minor who was invited to participate in meetings, events, and activities run and sponsored by Defendants.

8.  Defendant Boy Scouts of America ("BSA") was and is a federally chartered corporation authorized to do business in New Hampshire, with its principal place of business and its foreign agent for service located at 1325 W. Walnut Hill Lane, Irving, TX 75038. Defendant Daniel Webster Council of the Boy Scouts of America ("Daniel Webster Council") is a domestic nonprofit corporation organized under the laws of the state of New Hampshire and with its principal place of business and registered agent at 571 Holt Avenue, Manchester, NH 03109.

9.  Defendant BSA and Defendant Daniel Webster Council will be referred to collectively as "Defendants."

10.  Defendants jointly own and operate scouting programs which invite and seek out the participation of children.  Defendants, through their agents and officials, have control over those activities involving children. Defendants have the power to appoint, supervise, monitor, restrict, and fire each person working with children within the Defendants' scouting programs.

## JURISDICTION AND VENUE

11.  The Superior Court has subject matter jurisdiction over this matter pursuant to RSA 491:7.

12.  Venue is proper in Hillsborough County Superior Court South pursuant to RSA 507:9.

## STATEMENT OF FACTS APPLICABLE TO ALL PLAINTIFFS

13.  The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

14. This case involves claims of sexual abuse of the six the Plaintiffs by Defendants'
    Adult Leader Eugene Perreault ("Perreault"). Perreault is presently serving a
    sentence of 12 to 30 years for felonious sexual assault and aggravated felonious
    sexual assault. The BSA and the Daniel Webster Council received notice that
    Perreault was a high risk to sexually abuse boys before the Plaintiffs were abused
    but allowed him to remain a scoutmaster which permitted him to gain access to
    future victims.

### THE FAILURE OF THE DEFENDANTS TO PROTECT CHILDREN FROM SEXUAL ABUSE

15. In 1916, Congress granted BSA a federal charter, now codified as 36 U.S.C. Ch.
    309. Under that Charter, Congress granted BSA the exclusive right to BSA's name,
    emblems, badges, and descriptive words and markings.

16. Since 1910, BSA has derived millions of dollars a year licensing the rights to its
    name, emblems, scouting paraphernalia, and BSA-branded merchandise to
    affiliated scouting organizations throughout the United States and abroad (See 36
    U.S.C. §80305). BSA has realized income from these assets by marketing them to
    parents and their children, including the Plaintiffs and their parents. In addition to
    its exclusive license, BSA enjoys numerous taxpayer subsidies, including: (1) free
    access to national forest lands (16 U.S.C. § 539f); (2) free use of Defense
    Department equipment and facilities for BSA Jamborees (10 U.S.C.§2554); (3) free
    ground and air transportation, communications, emergency, and technical services
    from the National Guard (32 U.S.C. § 508); (4) free use of meeting facilities,
    transportation, and support services at United States military bases world-wide (10
    U.S.C. §2606); (5) free firearms, ammunition, repairs, supplies, and marksmanship
    training equipment (36 U.S.C. §40731); (6) free military surplus (10 U.S.C. Ch.
    943); and (7) Department of Agriculture grants (7 U.S.C. §7630).

17. BSA's marketing includes encouraging parents to enroll their children in Defendants' scouting programs and activities. Enrollment secures parents' and children's commitment to follow a system that encourages parents to entrust their children's health and safety to BSA. This entrustment empowers BSA to secure each child's oath to uphold the "Scout Law," to adopt the "Scout" identity, and to adhere to a system that requires children to engage in activities that expose them to adults and others. This system includes over-night outings, camping events, and trips away from parents. The system is reward-based, obligating the child to purchase emblems, badges, and other Scouting paraphernalia, which in turn creates profit for the organization.

18. BSA implements scouting programs through local Boy Scouts of America councils to which it issues licenses to the Boy Scouts of America name, emblems, badges, markings and youth programs. BSA requires local councils and troops within a local council to strictly adhere to BSA's organizational charter and "Standards of Leadership" requirements.

19. At all relevant times, the local council and troop to which the Plaintiffs were members were the agents of the BSA and were subject to BSA's authority and control.

20. BSA is one of the largest nonprofits in the United States, with income exceeding hundreds of millions per year. BSA is the largest youth organization in the United States, serving more than 2.7 million youth members, ages ten to eighteen, with over one million adult volunteers.

21. Shortly after its inception, Defendant BSA became aware that a significant number of its adult Boy Scout leaders ("Scout Leaders") were using their position of trust

5

and authority as Scout Leaders to manipulate and sexually abuse youth participating in Defendant BSA's scouting program.

22. Since its inception, BSA aggressively marketed the wholesomeness and safety of its programs to the American public. Simultaneously, BSA concealed from scouts and their parents BSA's certain knowledge that pedophiles had been infiltrating BSA in large numbers for many years. BSA also misrepresented to scouts and their parents that scouts were safe in scouting programs, when, in fact, scouts were at an unreasonably heightened risk of sexual abuse by adult Scout Leaders. BSA made said misrepresentations to the Plaintiffs and their parents.

23. By the early 1920s, Defendant BSA implemented what it called the "Red Flag" system to identify Scout leaders whom Defendant BSA considered "ineligible" to hold positions as Scout Leaders. This internal system eventually became known as the "Ineligible Volunteer Files" (hereafter "I.V. Files"). Historically, the most common reason for a Scout Leader to be placed in the I.V. Files has been allegations of sexual abuse of minors. This subset of I.V. Files has been referred to by Defendants as the "Perversion Files."

24. By 1935, Defendant BSA had already identified and removed over one thousand adult men from their positions as Scout Leaders for sexually abusing boys involved in Defendant BSA's scouting program.

25. Between 1935 and the events alleged herein in the 1990's, Defendant BSA had already identified thousands of additional Scout Leaders who were believed to have or were alleged to have sexually abused minor boys in Defendant BSA's scouting program. Not all of these adults were removed from their positions as Scout Leaders. Rather, at some point prior to 1955, Defendant BSA implemented a secret, internal "probation program." Under Defendant BSA's "probation program,"

6

a significant number of Scout Leaders believed to have sexually abused boys were allowed to continue on as Scout Leaders with access to minors. Neither boy scouts nor their parents were informed if a Scout Leader was on "probation," or that the reason for the probationary status was for sexually abusing minors. This probationary status evidenced the BSA's continued policy of denying or otherwise covering up the problem of sexual abuse within its ranks of adult leaders.

26. Defendant BSA went to significant lengths to keep the existence of their "Perversion File" system and the problem of sexual abuse by Scout Leaders a secret from scouts and the public. Local councils were instructed – and agreed – not to keep Perversion File materials at their offices, but rather to send everything to BSA national and destroy any copies.

27. Through the Perversion files, decades prior to the abuse of the Plaintiffs, the BSA possessed a unique knowledge of both the profile of Scout Leaders who sexually abuse scouts as well the methods these sexual abusers used to successfully infiltrate scouting. The I.V. files highlight the vulnerabilities of Defendants' scouting programs and activities, including sexual abusers' patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by sexual abusers that had entered or were attempting to enter scouting. For a century, BSA has known of distinctive characteristics of BSA's scouting programs that render scouts particularly prone to child sexual abuse by Scout Leaders.

28. By 1935, BSA had accumulated approximately hundreds of files on child molesters that had successfully infiltrated or attempted to infiltrate its programming. Between 1935 and the events alleged herein in the 1990's, Defendant BSA received thousands of reports of Scout Leaders sexually abusing boys in their program.

These reports were continuous in frequency over time and were spread throughout the geographic bounds of the Defendant BSA's scouting programs.

29. In the 1970s, BSA recognized the potential liabilities represented by possessing and maintaining the I.V. files. Over the course of two years in the early 1970s, three BSA executives reviewed and permanently destroyed thousands of I.V. files. BSA executives kept no retention logs showing which or how many of the files BSA destroyed. BSA made no contemporaneous record of its criteria in determining which files to destroy and which to save. Approximately 6,000 files survived BSA's file purge and are in BSA's possession. Approximately 1,900 of those files are now in the public domain. The exact number of sexual abuse reports received by BSA is unknown, in part because of the mid-1970s file purge. By 2005, BSA's secret cache of files (Perversion Files) on child molesters were in the thousands. These reports demonstrated to Defendant BSA that it had a continuous and systemic problem of adult volunteers sexually abusing boys participating in the Defendant's scouting program.

30. Defendants' knowledge of the danger of sexual abuse of boys in scouting included knowledge about how child abusing Scout Leaders accomplished their abuse. Prior to the abuse of the Plaintiffs by Perrault, the Defendants knew or should have known that child molesting Scout Leaders groomed their victims to accomplish their abuse and understood how such grooming was accomplished (including using the scouting program and activities to win the trust of victims, spending time alone with victim, and using mechanisms to lower victims' inhibitions and maintain victims' silence).

31. The I.V. Files, created prior to the Plaintiffs' participation in scouting, demonstrate that BSA had evidence (1) that scouting was continuously attracting pedophiles

8

across time and geography and (2) of scouting's distinctive characteristics that make it attractive to pedophiles, including:

    a.  Providing a sexual abuser access to boys alone and away from their parents in secluded settings like camp-outs and overnight hikes;

    b.  Providing opportunities for sexual abusers to abuse a scout by getting him into situations where they have to change clothing or spend the night with him;

    c.  Providing sexual abusers an opportunity to volunteer to spend time with and have access to minor scouts;

    d.  Conditioning and educating boys to the concept of strict obedience to the Scout Leader and a bonding mechanism that sexual abusers utilize;

    e.  Promoting the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a sexual abuser to keep his victims silent and compliant;

    f.  Conducting no criminal background checks on volunteers;

    g.  Not prohibiting adults from sleeping in tents with boys overnight;

    h.  Not prohibiting adult leaders from spending time alone with individual scouts; and

    i.  Not prohibiting adult leaders from having contact with scouts outside of authorized scouting activities.

    j.  Not specifically prohibiting Scout Leaders from having scouts to their home to work on scout related projects like merit badges.

32.  The I.V. Files further demonstrate that, for decades BSA:

    a.  Re-admitted sexual abusers who had previously been removed for child abuse "probation," thereby exposing unsuspecting children to sexual abuse;

b.  Had a practice of not reporting incidents of abuse to law enforcement;

c.  Had a pattern of accommodating sexual abusers, in which they would be permitted to resign from scouting and BSA would agree not to report the abuse to authorities;

d.  Failed to produce its I.V. Files to its review board and scout-safety consultants, who were endeavoring to develop and implement meaningful safeguards and barriers to pedophile infiltration;

e.  Refused to fingerprint, photograph, or perform background checks on its adult volunteers, allowing removed sexual abusers using an alias to sneak back into scouting through another troop;

f.  Refused to utilize widely-accepted organizational best practices that would establish reasonable barriers to intrusion by sexual abusers;

g.  Refused to educate local councils, staff, and troop leaders regarding the true risks posed by sexual abusers to scouts; and

h.  Refused to effectively monitor local councils and troops to ensure that appropriate safeguards were being used in the selection and retention of adult scout leaders.

33.  Prior to abuse alleged herein in the 1990's, Defendant BSA also knew or should have known that its I.V. File system did not function to prohibit all known predators from participating in scouting, was otherwise flawed, and in many cases ineffective to address the sustained and systemic problem of sexual abuse within its programming.

34.  Despite their knowledge of the danger of sexual abuse of boys in scouting, at no time prior to 2010 when the BSA altered the warnings in its Scout Handbook, did Defendants specifically warn boys in their programs or their parents, about this

10

known danger, nor implement reasonable and feasible child abuse prevention policies. Nor did BSA alert authorities to the nature and scope of this known danger. Instead, Defendants intentionally and actively concealed the continuous and systemic danger of sexual abuse of scouts in their programming. Defendants also actively promoted and represented to the public that their scouting programs were safe and wholesome, and their adult leaders were safe and trustworthy.

35. At all times relevant to this Complaint, Defendants invited and otherwise encouraged the participation of minors, including the Plaintiffs in this case, in their scouting programming and selected adults to serve in leadership positions.

36. BSA has known for decades that scouting involved an unreasonably high risk of sexual abuse by adult leaders and volunteers. BSA made repeated false counterfactual claims that the number of child sexual abusers in its programming was insignificant, that scouts were reasonably safe from sexual abuse by adult leaders, and that BSA is not a magnet for sexual abusers, all of which BSA made (1) knowing that the claims were false or (2) with reckless disregard for the truth or falsity. The Plaintiffs allege that they trusted BSA and that they reasonably relied upon the BSA's representations that it presented a moral and safe place for minors.

**EUGENE PERREAULT AND THE DEFENDANTS' PRIOR KNOWLEDGE OF HIS SEXUAL ABUSE OF CHILDREN**

37. Defendants selected or accepted Perreault as a scoutmaster, or in a similar capacity as a Scout Leader, for the Plaintiffs' Boy Scout troops, Troop 136 and Troop 2000, both located in the Daniel Webster Council.

38. Defendants authorized and empowered Perreault to perform all duties of a Scout Leader within Troop 136 and Troop 2000, including the authority and power to do the following: to provide instruction, counseling, moral guidance, and physical

supervision of boys participating in Boy Scout programs and activities; to enforce the rules governing the boys' participation; and to undertake other duties. Defendants knew that as part of his duties as a Scout Leader, Perreault would be in a position of trust, confidence, and authority over the boys involved in scout programs, including the Plaintiffs.

39. As a Scout Leader, Perreault befriended the Plaintiffs; gained the trust and confidence of the Plaintiffs and their families as a trusted authority figure, mentor and leader of boys; and gained the permission and support of the Plaintiffs and their parents to spend substantial periods of time alone with the Plaintiffs. As a Scout Leader, Perreault also gained the directive of the Plaintiffs' parents to minor the Plaintiffs that they respect those in authority with the BSA and Daniel Webster Council.

40. Thereafter, Perreault acted as a Scout Leader toward the Plaintiffs, supervised them during scouting outings and activities, and exercised authority *in loco parentis* over the Plaintiffs during scouting events.

41. There was a special relationship between the Plaintiffs and Defendants giving rise to a duty by Defendants to protects the Plaintiffs from harm.

42. As a result of Perreault's authorized conduct as a Scout Leader, the Plaintiffs were conditioned to trust Perreault, to comply with his directions, and to respect Perreault as a person of authority, including in moral and ethical matters.

43. Using the power, authority, and trust of his positions vested in him by the BSA and Daniel Webster Council, and availing himself of Defendants' representations that the scout programs were a moral and safe place for boys, Perreault subjected all the Plaintiffs to various acts of sexual abuse while the Plaintiffs were minors (hereafter "the sexual abuse").

44. Perreault would invite the Plaintiffs and other scouts over to his home to participate in various scouting activities. By inviting minor the Plaintiffs over to his home alone, Perreault was in violation of BSA's "two deep" rule, which requires that at least two adults be present at all times during all scouting events and all other activities related to the scouting programs.

45. The methods used by Perreault to accomplish his sexual abuse of the Plaintiffs were substantially similar to methods known to Defendants to have been used previously by numerous other adult leaders to accomplish sexual abuse of other scouts. These methods were known to the Defendants at least 20 years prior to the sexual abuse of the Plaintiffs.

46. Perreault's sexual abuse of the Plaintiffs was foreseeable to Defendants. Starting in 1991, Scout Leaders associated with the Daniel Webster Council in Epping received repeated telephone calls from a local resident who eventually became a police officer. This resident had been informed by two victims that they had been sexually abused by Perreault. These calls identified Perreault as a perpetrator of sexual abuse against children. The resident's calls to the boy scout officials in the Daniel Webster Council continued after she became a police officer in 1999. The calls were ignored by the scout officials who did nothing to investigate the resident's allegations.

47. During a Troop 136 camping trip in the late 1980's or early 1990's, a former scoutmaster for Troop 136 found Perreault sleeping in a tent with a minor scout. The scoutmaster counseled Perreault and told him he was not allowed to sleep in the same tent as minor scouts, but he did nothing more and failed to alert New Hampshire's child protection agency, the Division of Children Youth and Families ("DCYF"). The same scoutmaster would regularly observe Perreault place his arm

13

around minor scouts as well as have minor scouts sit on his lap and likewise failed to report it to DCYF.

48. Another Scout Leader with Troops 136 and 2000 would regularly observe Perreault have minor scouts sit on his lap. The same Scout Leader noted Perreault would occasionally break BSA's "two deep" leadership rule and knew Perreault would have scouts go to his home to shoot guns and do woodworking with no other Scout Leaders present. He also failed to report these violations to DCYF.

49. Scout Leaders were mandated child abuse reporters under New Hampshire law. RSA 169-C. At no time did any Scout Leader report Perreault to the New Hampshire Department of Children and Families despite the fact that there was reasonable cause to believe from 1991 forward that Perreault was sexually abusing children.

50. As set out in paragraphs 1 through 47 above, Defendants knew for decades prior to the Plaintiffs' abuse that sexual predators of boys were continually infiltrating scouting and using the scouting program to accomplish their sexual abuse of boys. Defendants knew their scouting programs were attractive to sexual abusers and knew the distinctive characteristics of scouting that render scouts particularly susceptible to sexual abuse.

51. Defendants knew or should have known the danger that sexual abusers presented to scouts long before the Plaintiffs were abused by Perreault. Despite this knowledge, Defendants ignored the danger and permitted Perreault and other sexual abusers in scouting to prey upon minor scouts, including the Plaintiffs, by failing to warn them of the danger and failing to implement reasonable policies to prevent and identify child sexual abuse in scouting programs.

14

52. As a direct result of the Defendants' conduct described herein, the Plaintiffs have suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and have incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

### FACTS SPECIFIC TO PLAINTIFF JOHN DOE AM

53. The Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

54. Perreault used the power, authority, and trust of his positions within the BSA and Daniel Webster Council, and availed himself of Defendants' representations that the scout programs were a moral and safe place for boys. Perreault subjected Plaintiff John Doe AM to various acts of sexual abuse while John Doe AM was a minor.

55. John Doe AM met Perreault when he joined scouts at the age of 10 in approximately 1991.

56. When John Doe AM was a minor and approximately 11 to 13 years old, Perreault would pick up John Doe AM up from his mother's home while his mother and grandmother were at work and there were no adults present.

57. Perreault would drive John Doe AM to Perreault's home in Newfields, New Hampshire to work on various scouting projects including woodworking for merit badges. Perrault and John Doe AM would be alone in the house on these occasions.

15

58.  Perreault brought John Doe AM to his home approximately two or three times per
     month during a six to eight-month period in 1994. After the first several visits,
     Perreault established a close relationship of trust with John Doe AM. Now, as an
     adult, John Doe AM realizes that Perreault was grooming him by establishing this
     close and trusting relationship while the two were alone in the house working on
     scouting projects.

59.  On one occasion Perreault used his hand to touch John Doe AM's inner thigh while
     the two were sitting next to each other at a table. The sexual abuse began on or
     about John Doe AM's fourth or fifth visit to Perreault's house.

60.  At a workbench in his home, Perreault would stand next to John Doe AM and put
     his hands on to John Doe AM's shoulders as well as other parts of his body.
     Perreault's touching of John Doe AM progressed to Perreault placing his hands
     inside John Doe AM's pants where he would touch John Doe AM's genitals.
     Perreault touched John Doe AM's genitals on numerous occasions. Perreault's
     abuse of John Doe AM was a violation of RSA § 639:2.

61.  As a direct result of the Defendants' conduct described herein, Plaintiff John Doe
     AM has suffered, and will continue to suffer great pain of mind and body, shock,
     emotional distress, physical manifestations of emotional distress, embarrassment,
     loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was
     prevented and will continue to be prevented from performing daily activities and
     obtaining full enjoyment of life; and has incurred and will continue to incur
     expenses for medical psychological treatment, therapy, and counseling.

62.  John Doe AM did not discover and could not have discovered in the exercise of
     reasonable diligence, the causal connection between the sexual abuse he endured
     as a child and his present psychological and emotional problems until March 2018

when he spoke to law enforcement concerning Perreault. In addition, John Doe AM did not discover, and could not reasonably have discovered, the causal role the BSA played in his injuries until March 2018, when he became aware that the BSA had allowed individuals who were known to have sexually abused children to serve as scoutmasters and when he discovered that the BSA had failed to prevent foreseeable harm to scouts by not adopting procedures and policies to prevent sexual abuse, despite the BSA's actual knowledge that individuals who were sexually abusing children were gaining access to victims by volunteering as scoutmasters. In addition, John Doe AM did not discover, and could not reasonably have discovered, until March 2018 that scoutmasters of the Daniel Webster Council had actual prior notice that Perreault was at risk to sexually abuse scouts. John Doe AM's claim is therefore timely under RSA § 504:4-g.

### FACTS SPECIFIC TO PLAINTIFF JOHN DOE DS

63. Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

64. Perreault used the power, authority, and trust of his positions within the BSA and Daniel Webster Council, and availed himself of Defendants' representations that the scout programs were a moral and safe place for boys. Perreault subjected Plaintiff John Doe DS to various acts of sexual abuse while John Doe DS was a minor.

65. Perreault was the scoutmaster of Troop 136 when John Doe DS joined as a scout in approximately May or June of 1998, when John Doe DS was approximately 11 years old. Soon after joining Perreault's Troop, Perreault would frequently rub John Doe DS's back.

17

66. Perreault routinely invited scouts in Troop 136 over to his house apart from official scouting trips. John Doe DS would ride his bike to Perreault's home with other scouts. On numerous occasions after other scouts left Perreault's home, John Doe DS was alone with Perreault.

67. On these occasions, John Doe DS sat in an office chair in front of Perreault's computer in the Perreault's bedroom. Then, Perreault would encourage John Doe DS to search for pornographic images while Perreault rubbed John Doe DS's back. Next, Perreault would kneel alongside John Doe DS, pull down John Doe DS's pants, and masturbate John Doe DS.

68. On one occasion, Perreault had John Doe DS and one other scout spend the night at Perreault's home. While other scout slept on the floor, Perreault slept in the bed with John Doe DS. Perreault removed John Doe DS's clothes, rubbed his hands all over John Doe DS's body and genitals, and orally copulated John Doe DS. On this occasion, Perreault also inserted his finger into John Doe DS's rectum.

69. Perreault sexually abused John Doe DS numerous times. Perreault's abuse of John Doe DS was a violation of RSA § 639:2.

70. As a direct result of the Defendants' conduct described herein, Plaintiff John Doe DS has suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and has incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling

71. John Doe DS did not discover and could not have discovered in the exercise of reasonable diligence, the causal connection between the sexual abuse he endured

as a child and his present psychological and emotional problems until October 2016 when he spoke to law enforcement concerning Perreault. In addition, John Doe DS did not discover, and could not reasonably have discovered, the causal role the the BSA played in his injuries until October 2016, when he became aware that the BSA had allowed individuals who were known to have sexually abused children to serve as scoutmasters and when he discovered that the BSA had failed to prevent foreseeable harm to scouts by not adopting procedures and policies to prevent sexual abuse, despite the BSA's actual knowledge that individuals who were sexually abusing children were gaining access to victims by volunteering as scoutmasters. In addition, John Doe DS did not discover, and could not reasonably have discovered, until October 2016 that scoutmasters of the Daniel Webster Council had actual prior notice that Perreault was at risk to sexually abuse scouts. John Doe DS's claim is therefore timely under RSA § 504:4-g.

### **FACTS SPECIFIC TO PLAINTIFF JOHN DOE DZ**

72.   Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

73.   Perreault used the power, authority, and trust of his positions within the BSA and Daniel Webster Council, and availed himself of Defendants' representations that the scout programs were a moral and safe place for boys. Perreault subjected Plaintiff John Doe DZ to various acts of sexual abuse while John Doe DZ was a minor.

74.   John Doe DZ and his family met Perreault through scouting.

75.   John Doe DZ joined cub scouts in approximately 1991 at the age of 7 years old.

76.   Perreault would routinely invite John Doe DZ and his brothers to his home where Perrault would engage the brothers in various scouting activities such as riflery

19

and woodworking.  Perreault would also invite John Doe DZ and his older brother to spend the night at his home.

77.  Perreault would sexually abuse John Doe DZ when he slept over at Perreault's home between January and July of 1995. Perreault would sleep in the bed with John Doe DZ, while John Doe DZ's older brother would sleep on the floor in the same room.

78.  While in bed with John Doe DZ, Perreault would press the front side of his body against the back side of John Doe DZ's body. Then, Perreault would take his hands and touch John Doe DZ's genitals while telling John Doe DZ he was checking to see if he was going through puberty. In addition to touching John Doe DZ's genitals, Perreault would also rub his hands over John Doe DZ's thighs and buttocks, usually touching the inside of the cheeks of his buttocks.

79.  On one of these occasions when John Doe DZ was approximately 10 years old, he spent the night at Perreault's home. Perreault was in bed with John Doe DZ and both Perreault and John Doe DZ were naked. On this occasion, John Doe DZ felt Perreault's penis directly against his back and buttocks area while Perrault was masturbating John Doe DZ.

80.  Overall, Perreault sexually abused John Doe DZ in Perreault's bed numerous times over the course of about seven months in 1995. Perreault's abuse of John Doe DZ was a violation of RSA § 639:2.

81.  Additionally, while at Perreault's home, he would frequently wrestle with John Doe DZ while asking John Doe DZ to give him a pull Perreault's underwear up while he was wearing it to give him a "wedgie".

82.  Perreault would also frequently have John Doe DZ (as well as other scouts) sit on his lap at various scouting events.

83. As a direct result of the Defendants' conduct described herein, Plaintiff John Doe DZ has suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and has incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

84. John Doe DZ did not discover, and could not reasonably have discovered, the causal role the the BSA played in his injuries until October 2016, when he became aware that the BSA had allowed individuals who were known to have sexually abused children to serve as scoutmasters and when he discovered that the BSA had failed to prevent foreseeable harm to scouts by not adopting procedures and policies to prevent sexual abuse, despite the BSA's actual knowledge that individuals who were sexually abusing children were gaining access to victims by volunteering as scoutmasters.  In addition, John Doe DZ did not discover, and could not reasonably have discovered, until October 2018 that scoutmasters of the Daniel Webster Council had actual prior notice that Perreault was at risk to sexually abuse scouts. John Doe DZ's claim is therefore timely under RSA § 504:4-g.

## FACTS SPECIFIC TO PLAINTIFF JOHN DOE DN

85. Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

86. Perreault using the power, authority, and trust of his positions within the BSA and Daniel Webster Council, and availing himself of Defendants' representations that the scout programs were a moral and safe place for boys, Perreault subjected

21

Plaintiff John Doe DN to various acts of sexual abuse while John Doe DN was a minor.

87. John Doe DN and his family met Perreault through scouting.

88. John Doe DN was approximately 4 years old when he met Perreault around 1993 because his older brothers were involved in scouting.

89. Perreault would routinely invite John Doe DN and his brothers to Perreault's home where they would engage in various scouting activities such as riflery and woodworking.

90. Perreault's sexual abuse of John Doe DN occurred numerous times at Perrault's home between the ages of 4 and 7 years old.

91. While John Doe DN's brothers were in another room of the house, Perreault would have John Doe DN sit on his lap while watching television. With John Doe DN on his lap, Perreault would take his hand and fondle John Doe DN's genitals under his clothes, directly on his genitals. Perreault would do this for approximately 20 to 30 minutes, or the duration of a television show episode. Perreault's abuse of John Doe DN was a violation of RSA § 639:2.

92. In approximately 2000, John Doe DN was at an event for Perreault's Troop 2000. At this event, Perreault had John Doe DN sit on his lap while Perreault placed his hands on John Doe DN's upper thighs. Another adult leader observed John Doe DN sitting on Perreault's lap.

93. On another occasion, during a trip to Hidden Valley Scout Camp, Perreault would have John Doe DN sit on his lap while Perreault placed his hands on John Doe DN's upper thighs.  Countless other scouts and leaders were present and observed John Doe DN sitting on Perreault's lap.

94.  As a direct result of the Defendants' conduct described herein, Plaintiff John Doe
     DN has suffered, and will continue to suffer great pain of mind and body, shock,
     emotional distress, physical manifestations of emotional distress, embarrassment,
     loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was
     prevented and will continue to be prevented from performing daily activities and
     obtaining full enjoyment of life; and has incurred and will continue to incur
     expenses for medical psychological treatment, therapy, and counseling.

95.  John Doe DN did not discover, and could not reasonably have discovered, the
     causal role the the BSA played in his injuries until October 2016, when he became
     aware that the BSA had allowed individuals who were known to have sexually
     abused children to serve as scoutmasters and when he discovered that the BSA
     had failed to prevent foreseeable harm to scouts by not adopting procedures and
     policies to prevent sexual abuse, despite the BSA's actual knowledge that
     individuals who were sexually abusing children were gaining access to victims by
     volunteering as scoutmasters. In addition, John Doe DN did not discover, and
     could not reasonably have discovered, until October 2018 that scoutmasters of the
     Daniel Webster Council had actual prior notice that Perreault was at risk to
     sexually abuse scouts. John Doe DN's claim is therefore timely under RSA § 504:4-
     g.

## FACTS SPECIFIC TO PLAINTIFF JOHN DOE PJ

96.  Plaintiff hereby incorporates by reference all previous paragraphs as if fully set
     forth herein.

97.  Perreault using the power, authority, and trust of his positions within the BSA and
     Daniel Webster Council, and availing himself of Defendants' representations that
     the scout programs were a moral and safe place for boys, Perreault subjected

23

Plaintiff John Doe PJ to various acts of sexual abuse while John Doe PJ was a minor.

98.   John Doe PJ and his family met Perreault through scouting.

99.   John Doe PJ was approximately 12 years old when he joined scouting and met Perreault in 1990.

100.  Perreault would routinely invite John Doe PJ to Perreault's home where they would engage in various scouting activities such as woodworking.

101.  Perreault sexually abused John Doe PJ on numerous occasions between the ages of 13 and 17 years old. The abuse took place in Perreault's home as well as on BSA camping trips.

102.  Perreault assaulted John Doe PJ the first night he spent the night at Perreault's home. On this occasion, John Doe PJ was asleep on the couch when he woke up to Perreault touching his genitals. Then, Perreault orally copulated John Doe PJ. This same series of abuse occurred on several other occasions when John Doe PJ spent the night at Perreault's home. This abuse would also occur on BSA camping trips. Perreault's abuse of John Doe PJ was a violation of RSA § 639:2.

103. As a direct result of the Defendants' conduct described herein, Plaintiff John Doe PJ has suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and has incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

104. John Doe PJ did not discover and could not have discovered in the exercise of reasonable diligence, the causal connection between the sexual abuse he endured

as a child and his present psychological and emotional problems until October 2016 when he spoke to law enforcement regarding Perreault. In addition, John Doe PJ did not discover, and could not reasonably have discovered, the causal role the BSA played in his injuries until October 2016, when he became aware that the BSA had allowed individuals who were known to have sexually abused children to serve as scoutmasters and when he discovered that the BSA had failed to prevent foreseeable harm to scouts by not adopting procedures and policies to prevent sexual abuse, despite the BSA's actual knowledge that individuals who were sexually abusing children were gaining access to victims by volunteering as scoutmasters. In addition, John Doe PJ did not discover, and could not reasonably have discovered, until October 2016 that scoutmasters of the Daniel Webster Council had actual prior notice that Perreault was at risk to sexually abuse scouts. John Doe PJ's claim is therefore timely under RSA § 504:4-g.

### FACTS SPECIFIC TO PLAINTIFF JOHN DOE PT

105. Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

106. Perreault using the power, authority, and trust of his positions within the BSA and Daniel Webster Council, and availing himself of Defendants' representations that the scout programs were a moral and safe place for boys, Perreault subjected Plaintiff John Doe PT to various acts of sexual abuse while John Doe PT was a minor.

107. John Doe PT and his family met Perreault through scouting.

108. John Doe PT was approximately 12 years old when he joined scouting and met Perreault in 1992.

109. Perreault would routinely invite John Doe PT to Perreault's home where they would engage in various scouting activities.

110. Perreault sexually abused John Doe PT on numerous occasions between the ages of 12 and 16 years old. The abuse took place in Perreault's home, on BSA camping trips, and in John Doe PT's home.

111. Perreault's abuse of John Doe PT included Perreault fondling John Doe PT's genitals, masturbating John Doe PT, orally copulating John Doe PT, John Doe PT orally copulating Perreault, and Perreault showing John Doe PT pornographic movies. Perreault's abuse of John Doe PT was a violation of RSA § 639:2.

112. As a direct result of the Defendants' conduct described herein, Plaintiff John Doe PT has suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and has incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

113. John Doe PT did not discover and could not have discovered in the exercise of reasonable diligence, the causal connection between the sexual abuse he endured as a child and his present psychological and emotional problems until February 2019 when he spoke to his brother regarding Perreault. In addition, John Doe PT did not discover, and could not reasonably have discovered, the causal role the BSA played in his injuries until February 2019, when he became aware that the BSA had allowed individuals who were known to have sexually abused children to serve as scoutmasters and when he discovered that the BSA had failed to prevent foreseeable harm to scouts by not adopting procedures and policies to prevent

sexual abuse, despite the BSA's actual knowledge that individuals who were sexually abusing children were gaining access to victims by volunteering as scoutmasters. In addition, John Doe PT did not discover, and could not reasonably have discovered, until February 2019 that scoutmasters of the Daniel Webster Council had actual prior notice that Perreault was at risk to sexually abuse scouts. John Doe PT's claim is therefore timely under RSA § 504:4-g.

### FIRST CAUSE OF ACTION - NEGLIGENCE

114. The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

115. The Defendants owed minor Plaintiffs a duty to protect them when they were entrusted to the Defendants' care by the Plaintiffs' parents. The Plaintiffs' care, welfare, and/or physical custody was temporarily entrusted to the Defendants' during the Defendants' scouting programs. A special relationship existed between the Plaintiffs and the Defendants.

116. The Defendants by and through their agents, volunteers, servants, and employees knew or reasonably should have known of Perreault's dangerous and exploitive propensities and/or that Perreault was an unfit agent and was at high risk to sexually abuse boys. Especially given the Defendants' knowledge of sexual abuse of minors by adults in scouting programs, it was foreseeable that if the Defendants did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to the Plaintiffs, the children entrusted in the Defendants' care would be vulnerable to sexual abuse by adults, including Perreault.

117. The Defendants breached their duty to minor the Plaintiffs by allowing Perreault to come into contact with them in scouting related activities without supervision; by

27

failing to adequately hire, supervise, or retain Perreault who they permitted and enabled to have access to the Plaintiffs; by failing to investigate or otherwise confirm or deny such facts about Perreault; by failing to tell or concealing from the Plaintiffs, the Plaintiffs' parents, or law enforcement officials that Perreault was or may have been sexually abusing minors; by failing to tell or concealing from the Plaintiffs' parents, DCYF or law enforcement that the Plaintiffs were or may have been sexually abused after the Defendants knew or had reason to know that the Plaintiffs may have been sexually abused by Perreault. Thereby, the Defendants enabled the Plaintiffs to continue to be endangered and sexually abused, and/or created the circumstances where the Plaintiffs were less likely to receive medical and mental health care and treatment required, thus exacerbating the harm done to the Plaintiffs; and/or by holding out Perreault to the Plaintiffs and their parents as being in good standing and trustworthy. The Defendants cloaked with the façade of normalcy the Defendants' and/or Perreault's contact and/or actions with the Plaintiffs, and/or disguised the nature of the sexual abuse and contact.

118. The Defendants' breach of their duty was the proximate cause of the Plaintiffs' injuries.

119. The harm suffered by the Plaintiffs was foreseeable to the Defendants. The Defendants were aware of the systemic widespread problem of sexual abuse by Scout Leaders and that this presented an unreasonable risk of harm to the Plaintiffs and other scouts.

120. As a direct result of the Defendants' negligent conduct described herein, the Plaintiffs have suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of

life; were prevented and will continue to be prevented from performing daily

activities and obtaining full enjoyment of life; and have incurred and will continue

to incur expenses for medical psychological treatment, therapy, and counseling.

## SECOND CAUSE OF ACTION - NEGLIGENT SUPERVISION AND PROTECTION OF PLAINTIFFS

121. The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

122. At all material times, the Defendants owed the Plaintiffs a duty, as scouts in their care, to use reasonable care to protect Plaintiffs' safety, well-being, and health while they were participating in scouting programs under the care, custody, or in the presence of the Defendants.

123. The Defendants, by and through their agents, volunteers, servants, and employees, knew or reasonably should have known that Perreault was an unfit agent and was at high risk to sexually abuse boys. Despite such knowledge, the Defendants negligently failed to supervise Perreault in his position of trust and authority over minor scouts, where he was able to commit the sexual abuse of the Plaintiffs.

124. The Defendants failed to provide reasonable supervision of Perreault, failed to use reasonable care in investigating Perreault, and failed to take reasonable measures to prevent future sexual abuse by Perreault.

125. Given the Defendants' actual and constructive knowledge of the potential dangers to the Plaintiffs, the sexual abuse of the Plaintiffs by Perreault was reasonably foreseeable to the Defendants.

126. Perreault's sexual abuse of the Plaintiffs occurred during scouting-related activities, and as a direct result of the Defendants' negligence in allowing Perreault unsupervised access to Daniel Webster Council scouts and entrusting the Plaintiffs to his care.

29

127. Perreault's sexual abuse of the Plaintiffs occurred during scouting-related activities designed for the furtherance of the Defendants' scouting programs; and as a direct result of the Defendants providing Perreault unfettered access to Plaintiffs and entrusting the Plaintiffs to Perreault's care.

128. The conduct of the Defendants described in all preceding paragraphs of this complaint was wanton, reckless, and oppressive.  As a direct result of the Defendants' wanton, malicious, and oppressive conduct, the Plaintiffs have suffered severe psychological, emotional, and physical injuries, shame, humiliation, outrage, insult to their honor and bodily integrity, and the inability to lead normal lives.

129. As a direct result of the Defendants' negligent supervision and failure to protect the Plaintiffs described herein, the Plaintiffs have suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and have incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

### THIRD CAUSE OF ACTION - FRAUD

130. The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

131. At all times relevant to this complaint, the Defendants invited and encouraged the Plaintiffs to participate in the scouting programs they administered and controlled, all the while representing their programs as being safe and beneficial for boys physically, emotionally, and spiritually. This invitation created a special, fiduciary

relationship, wherein these the Plaintiffs and their families relied upon the
Defendants' expertise and judgment in selecting safe, moral, and trustworthy men
to lead Boy Scout Troops.

132. The Defendants' representations to the Plaintiffs that scouting was physically,
emotionally, and spiritually beneficial, as well as safe, were substantial factors in
influencing the Plaintiffs' and their parents' decision to participate in scouting.

133. As set out above, the Defendants knew by at least 1975, if not earlier, that boys in
scouting were at risk of sexual abuse by Scout Leaders. The Defendants knew this
because historically noticeable numbers of the adult volunteers participating in
scouting were discovered to be child sexual abusers who used scouting programs
to gain access to and earn the trust of minors.

134. The Defendants had a duty to disclose known threats to the health and safety of
the minors involved in their scouting programs.  In the first alternative, the
Defendants' invitation to the Plaintiffs to participate in scouting upon payment of a
fee required the Defendants to disclose all matters material to entering into the
transaction, and known incidents of child sexual abuse by scout leaders. This
disclosure would have been material to each the Plaintiffs' decision to enter into
each transaction with the Defendants. In the second alternative, the Defendants
actively concealed the problem of child sexual abuse by scout leaders.

135. The Defendants' knowledge that pedophile scout leaders used the scouting
program to accomplish sexual abuse of boys constituted a material fact –
particularly in light of the Defendants' failure to change their programs, policies, or
procedures that they knew had been frequently used by pedophile scout leaders to
sexually abuse minors in the past.  The Plaintiffs would not have entered into a

relationship with the Defendants, the scouting program, Perreault, or any other of the Defendants' agents had they been aware of this fact.

136. The Defendants fraudulently misrepresented and failed to disclose, and/or actively concealed the dangers of sexual abuse of boy scouts by scout leaders (hereinafter the "fraudulent representations").

137. The Defendants knew that the fraudulent representations involved false representations or made the fraudulent representations with reckless disregard for the truth. The Defendants made the fraudulent representations with the intent of inducing the Plaintiffs (and other minors similarly situated), the Plaintiffs' families (and other parents and guardians similarly situated), and the community at large to rely on the fraudulent representations and thereby continue to trust the Defendants. The Defendants obtained a substantial economic benefit from this reliance upon the fraudulent representations.

138. The Plaintiffs', their parents', and guardians' reliance on the fraudulent representations resulted in the Plaintiffs engaging in a trust relationship with the Defendants and their agents, including Perreault. The reliance of the Plaintiffs and their parents or guardians was justified because they did not know, nor could they reasonably have known, that the Defendants were aware of a significant danger of sexual abuse by Scout Leaders in general based on the known sustained and systemic problem of pedophile Scout Leaders using scouting to accomplish sexual abuse of boys.

139. The Plaintiffs and their parents or guardians reasonably relied on the fraudulent representations by the Defendants and reasonably believed that scouting was safe and did not pose a known danger of sexual abuse to scouts. The Plaintiffs and

their parents and guardians acted to their detriment in allowing the Plaintiffs to participate in scouting based on this reliance.

140. The Plaintiffs and their parents reasonably relied on the fraudulent representations by the Defendants and reasonably believed that Perreault was safe and did not pose a known danger of sexual abuse. The Plaintiffs and their parents acted to their detriment in allowing the Plaintiffs to participate in scouting with Perreault based on this reliance.

141. As a direct result of the Defendants' fraudulent conduct described herein, the Plaintiffs have suffered, and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life; and have incurred and will continue to incur expenses for medical psychological treatment, therapy, and counseling.

**FOURTH CAUSE OF ACTION - FRAUDULENT CONCEALMENT**

142. The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

143. The Plaintiffs' claims for negligence and fraud against the Defendants are timely as set forth above in Paragraphs. In addition, the Plaintiffs' claims are timely because the applicable statutes of limitations were equitably tolled based on the Defendants' fraudulent concealment as set out in the following paragraphs.

144. The Plaintiffs' claims for negligence and fraud against the Defendants were fraudulently concealed by the Defendants.

145. The Defendants committed the following positive acts of concealment of its negligence and fraud regarding the nation-wide, systemic problem of sexual abuse in scouting programs:

    a. Creating, continuing, and maintaining a secret system for handling internal reports of abuse;

    b. Adopting procedures, policies or practices requiring that all reports of child sexual abuse in scouting be kept secret within the organization;

    c. Adopting procedures, policies or practices discouraging reporting to law enforcement allegations of child sexual abuse in scouting;

    d. Adopting procedures, policies or practices (internally called "Probation") allowing known child sexual abusers to continue on as Scout Leaders, sometimes in different geographic areas, without informing scouts or parents or Local Councils about the danger posed and while misrepresenting the Scout Leader on "probation" as safe and worthy of scouts' trust;

    e. Requiring the documentation regarding instances of child sexual abuse in scouting programs be sent to national headquarters and forbidding the retention of such documents in local scout offices to avoid their discovery by outsiders;

    f. Intentionally destroying documents regarding instances of child sexual abuse in scouting;

    g. Actively dissuading victims and their parents from reporting to law enforcement regarding abuse in scouting;

    h. Actively dissuading victims and their parents from taking civil legal action regarding abuse in scouting;

    i.  Actively discouraging law enforcement and media from mentioning abusers' connections to scouting; and

    j.  Actively maintaining the secrecy of BSA's database regarding child sexual abuse in scouting, including opposing efforts by law enforcement, courts, and others to obtain documents from BSA's database.

146. In light of the facts set out above, the Plaintiffs could not through their own reasonable efforts or diligence have discovered the Defendants' negligence, fraud, or sufficient other facts upon which to bring this lawsuit against the Defendants more than three years before filing suit. The Defendants' negligence and fraud could not have been discovered through reasonable diligence more than three years before filing suit.

147. The Plaintiffs were not aware of the basis of their claims for negligence and fraud against these the Defendants until Perreault was criminally charged for sexually abusing boy scouts in November of 2016.

148. A reasonable person in the Plaintiffs' circumstances, who were suffering the psychological effects of child sexual abuse perpetrated upon them by someone they knew and trusted, would not have discovered facts indicating BSA's negligence or fraud prior to November of 2016 when Perreault was criminally charged.

149. The Defendants took affirmative action to prevent the Plaintiffs' discovery of its misrepresentations regarding the safety of scouting despite prior knowledge and concealment of extensive information regarding thousands of instances of child sexual abuse of scouts by Scout Leaders.

150. On information and belief, the Defendants' fraudulent concealment was furtively planned and secretly executed to keep the Plaintiffs' causes of action and similar causes of action against the Defendants concealed. In the alternative, on

information and belief, the Defendants' fraudulent concealment was perpetrated in ways such that the concealment and the Plaintiffs' causes of action against the Defendants concealed themselves.

### FIFTH CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY

136. The Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

137. The Plaintiffs were all enrolled as Boy Scouts and participated actively in scouting programs. The Plaintiffs' care was entrusted to the Defendants when they were children and their physical custody and well-being was temporarily entrusted to the Defendants' during the Defendants' scouting programs. The Plaintiffs were dependent upon the Defendants when they participated in the Defendants scouting programs and the Defendants owed them a duty to act in good faith and with due regard for their interests.

138. The Defendants had a fiduciary duty to the Plaintiffs to create an environment where they could safely participate in scouting programs free from sexual abuse by their agents such as Perreault.

139. The Defendants breached the fiduciary duty they owed the Plaintiffs by engaging in the actions and inactions described above, including, without limitation, allowing Perreault to participate in scouting programs involving the Plaintiffs when the Defendants, by and through their agents, volunteers, servants, and employees, knew or reasonably should have known that Perreault was an unfit agent and was at high risk to sexually abuse boys.

140. The Defendants' conduct was wanton, malicious, outrageous and conducted with full knowledge of the law. The Defendants exhibited reckless indifference to the foreseeable risks of harm to the Plaintiffs.

36

141. As a direct result of the Defendants' breach of fiduciary described herein, Plaintiffs

have suffered, and will continue to suffer great pain of mind and body, shock,

emotional distress, physical manifestations of emotional distress, embarrassment,

loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were

prevented and will continue to be prevented from performing daily activities and

obtaining full enjoyment of life; and have incurred and will continue to incur

expenses for medical psychological treatment, therapy, and counseling.

WHEREFORE, the Plaintiffs demand judgment against the Defendants, Boy

Scouts of America and Daniel Webster Council, Boy Scouts of America, for

compensatory damages, enhanced compensatory damages, costs and such other and

further relief as this Court deems proper.

Respectfully submitted,
John Doe AM, John Doe DS, John Doe
DZ, John Doe DN, John Doe, PJ, and
John Doe PT, Plaintiffs
By their attorney,


Jonathan Barnes, NH Bar #20061
Clark Hunt Ahern & Embry
150 Cambridge Park Dr.
Cambridge, MA 02140
617-494-1920
Fax: (617) 494-1921
jbarnes@chelaw.com

Dated:  May 7, 2019